MERRICK B. GARLAND
Attorney General of the United States

ALEXANDER M.M. UBALLEZ
United States Attorney

SEAN J. SULLIVAN
Special Attorney
U.S. Department of Justice
U.S. Attorney's Office, District of New Mexico
201 Third Street, NW, Suite 900
Albuquerque, New Mexico 87102
Telephone: (505) 224-1514
E-mail: sean.j.sullivan@usdoj.gov
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR18-01309-TUC-RM (BPV) |
| Plaintiff, | |
| vs. | THE UNITED STATES' BRIEF IN SUPPORT OF MOTION TO REVOKE DEFENDANT'S CONDITIONS OF RELEASE |
| Richard A. Madril, | |
| Defendant. | |

On August 5, 2022, the United States filed Doc. 244, a motion to revoke the conditions of supervised release that currently apply to the defendant, Richard A. Madril (hereinafter, "Defendant"), as imposed by the Honorable Rosemary Márquez, United States District Judge, in her judgment of December 3, 2020, Doc. 190. The Honorable Leslie A. Bowman, United States Magistrate Judge, held on evidentiary hearing on the United States' motion on November 16, 2022. Doc. 275; Transcript of Proceedings Status/Evidentiary Hearing, prepared and certified by Cindy J. Shearman on November 22, 2022 (hereinafter, "Hg. Tr."), at 1-105. At the conclusion of the hearing, Magistrate Judge

Bowman directed the parties to submit briefs in support of their positions on the United States' motion within ten days of receipt of the transcript of the hearing.  Hg. Tr. at 102.  The United States received the transcript on November 22.  The United States' arguments in support of an order revoking Defendant's conditions of release are set forth below.

I.   Background

On December 6, 2019, a jury found Defendant guilty of conspiracy.  Doc. 124.  The evidence at trial supporting his conviction consisted of testimony and documentary evidence about his criminal conduct while operating a law practice with his wife and co-defendant, Marivel Cantu-Madril (hereinafter, "Cantu-Madril").  Docs. 131-133; 153.  Much of the trial evidence is relevant to the United States' motion to revoke his conditions of supervised release because Defendant chose to testify at the hearing on this motion and make his credibility an issue.  The trial evidence casts serious doubt on his character for truthfulness and veracity before the Court.

In particular, the evidence at trial showed Defendant lied to clients on several different occasions.  Cantu-Madril admitted to the jury that she gave false documents to one particular client, Francisco Pinon-Navarro.  Doc. 133 at 72 (Cantu-Madril: "I'm going to admit that they are false documents[.]")  These false documents directed Pinon-Navarro to appear for appointments at an immigration office that were never actually scheduled.  Doc. 132 at 122-27.  Defendant assisted Cantu-Madril in deceiving Pinon-Navarro by going inside the immigration building at the time of one of these supposed appointments and, upon returning, advising Pinon-Navarro, in sum and substance, that Defendant had talked to an official who had informed him Pinon-Navarro's appointment had been

"cancelled."  Doc. 132 at 126.

According to the trial evidence, Defendant also assisted Cantu-Madril in deceiving another client, Juan Carlos Ordonez-Leon, by telling him he did not need to attend a hearing in immigration court where he faced removal from the United States.  Doc. 131 at 159.  This occurred after Cantu-Madril had been suspended from the practice of law and Defendant was Ordonez-Leon's only licensed attorney.  Doc. 133 at 130 ("Q. So at the meeting before the hearing with Mr. Ordonez-Leon, you were the only attorney in the room; isn't that right?  A. That is correct.")  According to Defendant's trial testimony, Cantu-Madril only acted as a "translator" at this meeting.  Doc. 133 at 106, 129.  Ordonez-Leon contradicted Defendant, however, by testifying that Defendant specifically told him Cantu-Madril was his lawyer.  Doc. 131 at 159-60 ("Q. What did Richard say about the hearing?  A. "Listen to the attorney. Do not show up under any circumstances." Q. When he said "the attorney," who did you think he was talking about? … A. Well, the lady attorney, Marivel Cantu.")

Furthermore, Defendant's trial testimony contradicted the testimony of an immigration judge, the Honorable Sean Keenan, who told the jury that Defendant asked him to conduct a hearing without Defendant's client, Mr. Ordonez-Leon, present.  Doc. 132 at 50 ("Mr. Madril … asked me to proceed in the case without his client, that his client was having transportation problems, and that he wanted to waive asylum and apply for voluntary departure.  I told him that, no, I would not do that, we would give his client an opportunity to appear at court … and see if he agreed with this proposal.")  Defendant, for his part, denied this.  Doc. 133 at 177-18 ("I told Judge Keenan, "Judge, Your Honor, my

client's having car trouble. We've agreed on going forward with pre-conclusionary voluntary departure," and I left it at that.")

The trial testimony further established that there were numerous false documents at the law office Defendant shared with Cantu-Madril when special agents from Homeland Security Investigations ("HSI") searched the premises on October 12, 2016.  Doc. 133 at 8-34.  Indeed, Defendant acknowledges as much in his testimony at the hearing on the motion to revoke his conditions of supervised release.  Hg. Tr. at 96 (Q. And in the possession of the law office at the time were lots of fake letters, correct?  A. Yes, sir.") Notably, investigators found some of these false documents in Defendant's personal work area.  Doc. 133 at 140-141.

The trial testimony also included testimony from an office manager, Yazmin Salazar, that Defendant did not inform all of his clients when his law partner, Cantu-Madril, had been suspended from the practice of law and could no longer represent them.  Doc. 132 at ("Q. Now, a lot of clients knew that Mari[vel] wasn't practicing law anymore; correct?  A. A lot of the clients didn't know.")

On December 2, 2020, the District Court sentenced Defendant to six months in prison followed by three years of supervised release.  Docs. 189-90, 205.  The terms of Defendant's supervised release included a special condition (hereinafter, "Special Condition 6") which states that Defendant is "prohibited from being self-employed in the legal field but may work as such an employee with the prior approval of the probation officer if [his] employer is aware of potential third-party risks." Doc. 190 at 4.  The State

Bar of Arizona suspended Defendant from the practice of law on January 21, 2021.[1] Defendant completed his term of imprisonment and began his period of supervised release on June 30, 2021.[2] The State Bar of Arizona disbarred him on September 27, 2021.

II.   Applicable Law

A.   Supervised Release

A district court, "in imposing a sentence to a term of imprisonment for a felony … may include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment[.]" 18 U.S.C. § 3583(a). "In determining whether … a [particular] term of supervised release [should] … be included," the court must "consider the [sentencing] factors set forth in" 18 U.S.C. § 3533(a). 18 U.S.C. § 3583(c). These include the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[,]" 18 U.S.C. § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct[,]" 18 U.S.C. § 3553(a)(2)(B), "to protect the public from further crimes of the defendant[,]" 18 U.S.C. § 3553(a)(2)(C), and to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[,] 18 U.S.C. § 3553(a)(2)(D). Any proposed term of supervised release must be "reasonably related to" the sentencing factors and "involve[] no "greater deprivation of liberty than is reasonably necessary for

---

[1] https://www.azbar.org/for-lawyers/practice-tools-management/member-directory/.

[2] https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results

the purposes" of sentencing. 18 U.S.C. § 3583(d). Where appropriate, a special condition of supervised release may restrict a defendant's employment in a specific field or profession. *See e.g.*, *United States v. Bautista-Gunter*, 22 F.4d 506, 510-11 (5th Cir. 2022) (prohibiting defendant from working in law enforcement); *United States v. Preacely*, 702 F.3d 373, 376-77 (7th Cir. 2012) (prohibiting defendant from working as a tax preparer).

After imposing conditions of supervised release for a defendant, the district court retains the power to modify or revoke them. 18 U.S.C. § 3583(e). In particular, the court may "revoke a term of supervised release … if the Court … finds by a preponderance of the evidence that the defendant violated a condition of supervised release[.]"). 18 U.S.C. § 3583(e)(3). Before modifying a condition of supervised release, "the court must hold a hearing, at which the person has the right to counsel and an opportunity to make a statement and present any information in mitigation." Fed. R. Crim. P. 32.1(c)(1). Further, "[w]hen a term of supervised release is revoked and the defendant is required to serve a term of imprisonment, the court may include a requirement that the defendant be placed on a term of supervised release after imprisonment." 18 U.S.C. § 3583(h). When conducting a hearing, a magistrate judge must make findings as to the credibility of the witnesses who testify. *See e.g., United States v. Mejia*, 69 F.3d 309, 316 (9th Cir. 1995) ("Because the magistrate sees and hears live testimony, he has an adequate basis for making credibility determinations.").

          B.      <u>Rules of the Legal Profession</u>

The Rules of Professional Conduct are very clear. A non-attorney who is employed in the legal field must work under the supervision of a licensed attorney. *See* Arizona Rules

of Professional Conduct 5.3.  A supervising attorney may delegate a wide range of tasks to a properly supervised non-attorney. *See American Bar Association Model Guidelines for the Utilization of Paralegal Services* (2021) at 5 ("Many tasks may be delegated to paralegals so long as they are properly supervised.").[3]  However, a non-attorney employee may not  overstep their bounds to "engage in the unauthorized practice of law." *Id*. at 6. In particular, a non-attorney may not take "(a) [r]esponsibility for establishing an attorney-client relationship[;] (b) [r]esponsibility for establishing the amount of a fee to be charged for a legal service[;] … [or] (c) [r]esponsibility for a legal opinion rendered to a client." *Id*. at 9.

> The Supreme Court of the State of Arizona defines "legal advice" as:
>
>> 1.   A written or oral statement that interprets some aspect of the law, court rules, court procedures, or recommends a specific course of conduct in an actual or potential legal proceeding.
>>
>> 2.   A written or oral statement that applies the law to an individual's specific factual circumstances.
>>
>> 3.   A written or oral statement that requires the person giving advice to have knowledge of the law and legal principles beyond familiarity with court requirements and procedures.[4]
>
> The American Bar Association defines the "practice of law" as "the application of

---

[3] These " "[t]asks … are delineated by various states, but generally include … factual investigation and research, legal research, the preparation of legal documents, attending client conferences, corresponding with and obtaining information from clients, witnessing the execution of documents, preparing transmittal letters, and maintaining estate/guardianship trust accounts." *Id*.

[4] https://www.azcourthelp.org/faq/what-is-legal-advice/97-what-is-legal-advice

legal principles and judgment with regard to the circumstances or objectives of a person that require the knowledge and skill of a person trained in the law."[5]

### III. Summary of Hearing

The hearing focused on Defendant's conduct at a meeting in August 2021 with two women, Ms. Lucia Duarte (hereinafter, "Ms. Duarte"), and her daughter, Ms. Lucia Marisol Chrystal Jacquez (hereinafter, "Ms. Jacquez"), about Ernesto Jacquez Aguirre (hereinafter, "Mr. Aguirre"), who is Ms. Duarte's husband and Ms. Jacquez's father.  Hg. Tr. 1-105. Mr. Aguirre is a non-citizen who previously received legal services in the area of immigration law from Defendant and Cantu-Madril. *Id*.  The United States alleges that Defendant violated Special Condition 6 at this meeting by straying beyond the boundaries of employment in the legal field imposed by the District Court in Special Condition 6 of the Defendant's judgment of conviction.  *See* Doc. 244.

During the hearing, the Court advised the parties, "[T]he issue is … was he working under the supervision of an employer or was he self-employed during this meeting? I think that's the issue because that's what the condition requires." Hg. Tr. at 30.  Later, in ruling on an objection from the defense, the Court further stated, "[I]f he's meeting with a client at the law firm who is not a client of Richard S. Madril, then he's not working within the scope of his employment under the supervision of someone who's aware of the third-party

---

[5] https://www.americanbar.org/groups/professional_responsibility/task_force_model_definition_practice_law/model_definition_definition/

- 8 -

risks, so I think it is relevant." *Id*. at 33.  The Court further advised the parties, "I need to know today to figure out whether to grant or deny the motion is what Richard S. Madril, the father, knew about these people and this meeting that was happening at his law office. And, you know, whether -- whether his son discussed it -- you know, whether he was employed during this conversation. Was it part of his employment, I guess, would be the question." *Id*. at 42.   The Court further stated, "I'm really … concerned about the … employment arrangement  … [a]nd the steps that were taken to supervise … [i]n order to determine whether this was part of employment or whether it was outside the scope." *Id*. at 64-65.

The evidence at the hearing clearly answers the Court's questions.  Indeed, many of the essential facts needed to rule on the United States' motion are undisputed.  For one thing, Defendant began employment at his father's law office upon his release from prison. *Id*. at 18.  Ernesto Jacquez Aguirre was never a client of Defendant's father.  *Id*. at 56.  at Neither was Ms. Duarte or her daughter, Ms. Jacquez.  *See id*. Defendant did, however, have a prior attorney-client relationship with the Aguirre/Duarte/Jacquez family dating back to his practice of law with Cantu-Madril prior to their disbarments.  *Id*. at 76.  These facts are not in controversy.

At the hearing, Defendant testified that he intended to meet with Ms. Duarte and Ms. Jacquez for the sole purpose of providing them with a piece of mail concerning Mr. Aguirre's case that had arrived at Defendant's home while he was imprisoned.  *Id*. at 73-74 ("Q. … So when you met with her that day, the only agenda you had was to hand her what you got in the mail? A. Correct.")  Defendant testified this was not a "formal

- 9 -

meeting." *Id*. at 74-75. Defendant met with them in "inside the lobby" of his father's law practice rather than in a "formal office" at the location typically used for "intake" and "confidential conferences" with prospective clients. *Id*. at 77. Defendant testified to "rushing" Ms. Duarte and Ms. Jacquez to leave because, according to him, "I just wanted to give them their information and have them go home." *Id*. at 75. Although the Aguirre/Duarte/Jacquez family owed Defendant a substantial amount of money for his prior legal services, Defendant insisted at the hearing, "I was not trying to collect any debt. I was just wanting them to get out of the office." *Id*. at 76.

According to Defendant, he had "no ambition to try to get Lucia Duarte to pay [her] legal bills[.]" *Id*. This is important because the Court correctly noted at the hearing that Defendant could permissibly meet with former clients to collect unpaid debts without running afoul of the restrictions on his employment imposed by the District Court. *Id*. at 38 (Court: "[I]f he did prior work while he was a licensed attorney and there were still attorney's fees outstanding, is he allowed to talk about that and collect those fees? In other words, if it's not for current or future legal work but someone, you know, still owes him a bunch of money … [.]") Defendant claimed at the hearing, however, that debt collection was not the purpose of his meeting with Ms. Duarte and Ms. Jacquez.[6]

---

[6] Ms. Duarte paid Defendant $2000 in cash during a meeting with Defendant in December 2020, according to statements she made to HSI as summarized in a report of investigation attached to the United States' motion, Doc. 244, Ex. 4 at 1. During the meeting with Ms. Duarte and Ms. Jacquez in August 2021, Defendant spoke of the Aguirre/Duarte/Jacquez family still owing him a "big pie." Hearing Ex. 7; Doc. 244, Ex. 6 at 3. Defendant told Ms. Duarte and Ms. Jacquez, "I'll figure it out and go from there." *Id*. This suggests Defendant actually intended to collect from the Aguirre/Duarte/Jacquez in the future. This evidence further supports the prosecution's theory at the hearing that Defendant was "stringing" them along with bits of legal advice so that they would eventually pay him. Hg. Tr. at 39-40.

Based on Defendant's own testimony, it is clear that he was not acting within the scope of his employment as a paralegal or legal assistant for his father when he met with Ms. Duarte and Ms. Jacquez in August 2021. Rather, Defendant testified under oath that he arranged this meeting solely to give Ms. Duarte a piece of mail. Nevertheless, Defendant provided legal services at this meeting, whether he expected to or not, and those legal services cannot be attributed to his father's law practice. He was not working under the supervision of a licensed attorney who knew the third-party risks to the Aguirre/Duarte/Jacquez based on Defendant's prior conduct, suspension, and disbarment. In doing so, Defendant violated the conditions of his supervised release by being self-employed in the legal field.

The Court has advised the parties that it is not concerned about whether Defendant's conversation with Ms. Duarte and Ms. Jacquez involved legal advice or the practice of law. *Id*. at 30 ("I think that's the issue because that's what the condition requires. It doesn't say: Don't give advice. Don't practice law. I mean, it doesn't really say any of that.") However, Special Condition 6 specifically forbids Defendant from being "self-employed *in the legal field*[.]" Doc. 190 at 4 (emphasis added). Therefore, the nature of Defendant's conversation with Ms. Duarte and Ms. Jacquez does matter in deciding this issue regardless of whether it amounted to legal advice or practice per se.

The recordings and transcripts of the conversation show that Defendant discussed various legal topics with Ms. Duarte and Ms. Jacquez. According to the Oxford English

Dictionary, "legal' means "[o]f or relating to law; falling within the province of law."[7] This conversation plainly involved the discussion of "law," particularly United States immigration law as it applies to Mr. Aguirre, a non-citizen, and tax law, as it applies to Ms. Duarte and/or Ms. Jacquez claiming the Earned Income Tax Credit.  In talking with Ms. Duarte and Ms. Jacquez, Defendant did more than just tell them about certain points of immigration law generally, such as travel authorization, work authorization, and the consequences of living in the United States without lawful status.  Defendant talked to Ms. Duarte and Ms. Jacquez about how these legal matters affected Mr. Aguirre specifically.

Indeed, Defendant told Ms. Duarte and Ms. Jacquez, "I don't see [Mr. Aguirre] getting into any trouble" despite his lack of lawful status in the United States.  Hg. Ex. 6; Doc. 244, Ex. 5 at 3.  This is a clear example of ordinary people relying on the knowledge and judgment of a specialist (in this case, someone who had been their lawyer) to guide them through a complex government process involving the province of law.  There are also more examples of this in the record.  For example, Defendant told Ms. Duarte and Ms. Jacquez what might happen if "there's a domestic violence situation at [their] house" and law enforcement "want[s] to check everyone's ID[.]"  Hg. Ex. 6; Doc. 244, Ex. 5 at 5.  Defendant also told them "the chances [of] … getting away with" having an invalid Social Security card "are fairly high." Hg. Ex. 6; Doc. 244, Ex. 5 at 8.  It is reasonable to expect the Aguirre/Duarte/Jacquez to trust what Defendant told them about American immigration

---

[7] https://www.oed.com/view/Entry/107008?redirectedFrom=legal#eid

law and enforcement based on his superior knowledge of this subject matter. Indeed, they had paid Defendant and Cantu-Madril to help navigate them through the immigration law process in the past, including Cantu-Madril "pull[ing] some strings" to obtain Mr. Aguirre's release "on bond." Hg. Ex. 6; Doc. 244, Ex. 5 at 2. The nature of Defendant's conversation with Ms. Duarte and Ms. Jacquez shows why the third-party risks of Defendant's employment in the legal field are so concerning.

To be sure, Defendant's father, Richard S. Madril, testified at the hearing that he knew his son was meeting with these clients. Hg. Tr. at 52-53. However, Richard S. Madril specifically stated that Defendant spoke of Ms. Duarte as "a former client" and that there was a "possibility" she might hire him to do legal work in the future, *id*. at 52-53, which never actually occurred, *id*. at 56. Thus, the record does not show that Defendant informed his father of the particulars of immigration law he discussed with Ms. Duarte and Ms. Jacquez and his father did not supervise him in those discussions to mitigate any third-party risks. Indeed, Richard S. Madril testified that he did not have a file on the Aguirre case or even an intake sheet as typically completed by office staff when meeting with prospective clients. *Id*. at 55. Yes, Defendant's father testified that he does not believe his son gave "legal advice" to Ms. Duarte and Ms. Jacquez. But as the Court has previously stated, the disposition of this motion does not depend on this fine point. In considering Richard S. Madril's testimony as a whole, the Court should recognize that he loves his son, considers him a valuable employee at his firm, and "disagreed" with the outcome of Defendant's trial. *Id*. at 47, 56-57. Moreover, Richard S. Madril has had his own troubles with the State Bar of Arizona, including a matter in 2013 where he agreed he violated the

Rules of Professional Conduct "when he failed to provide a written agreement conveying the scope of the representation and the basis or rate of the fee and expenses" and "when he applied the bond exoneration monies to his outstanding fees without sufficient explanation to his client."[8]  According to Richard S. Madril's testimony at the hearing, "it was an old client that I had continual representation with, I think I had maybe about three or four representations with, and the one time that I didn't have him sign a contract, that's when I was reprimanded on."  Based on this past experience, Richard S. Madril should have appreciated the importance of dealing with clients from the past and carefully documenting the "scope of the representation" at every stage.  But looking at the bigger picture, the Court should take any testimony from Defendant's loving father with a grain of salt.

IV.   Other Considerations

The Court has acknowledged its limited role in writing a report and recommendation to the district court on the United States' motion to revoke Defendant's conditions of supervised release.  Hg. Tr. at 41, 103.  As the Court has stated, only the district court is authorized to modify the Defendant's conditions of supervised release.  *Id*. at 41.  Nevertheless, the United States points out the sentencing factors of 18 U.S.C. § 3553(a), which the district court must consider as part of the ultimate decision on the government's motion.  Given Defendant's history of deceiving clients in the legal field, including lying

---

[8] https://www.azcourts.gov/Portals/101/Modified%20Agreement%20(Madril).pdf?ver=Hq0HD5PpvKqg0X7FNezR6A%3d%3d

to them and possessing false documents in his workspace, he will only be deterred from committing similar crimes in the future, *see* 18 U.S.C. § 3553(a)(2)(B), if he is shown that violation of criminal law, court mandates, and professional responsibility standards pertaining to the legal profession have serious consequences, especially after he has served an initial term of imprisonment and supposedly on the path to rehabilitation. The Court cannot achieve this purpose if Defendant thinks he can simply slide into the role of "paralegal" and continue to meet with and potentially deceive clients as his wife did by claiming she was a mere "translator" after being suspended from the practice of law.

Further, members of the public - including others like the Aguirre/Duarte/Jacquez family and clients of Richard S. Madril - can only be protected from future criminal conduct by Defendant if he is punished sufficiently here. *See* 3553(a)(2)(C). Moreover, Defendant will only receive the vocational training he needs if he is working in the legal profession, or any other field for that matter, under the supervision of ethical and conscientious overseers who are mindless of his history, the third-party risks he poses, and the need for very close oversight of his activities. *See* 18 U.S.C. § 3553(a)(2)(D).

V. Conclusion

Based on the evidence presented at the hearing, the Court should find by a preponderance of the evidence that Defendant violated the special condition of his supervised release forbidding him from self-employment in the legal field but permitting him to work as an employee in the legal field with the prior approval of his probation officer if his employer is aware of potential third-party risks. *See* 18 U.S.C. § 3583(e)(3).

Respectfully submitted this 2nd day of December, 2022.

                         MERRICK B. GARLAND
                         Attorney General of the United States

                         ALEXANDER M.M. UBALLEZ
                         United States Attorney

                         *s/ Sean J. Sullivan*
                         SEAN J. SULLIVAN
                         Special Attorney

Copy of the foregoing served electronically or by
other means this 2nd day of December, 2022, to Isabel Amsel.