# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | No. CR-18-01309-TUC-RM (LAB) |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| v. | ) | |
| Richard A. Madril, | ) | |
| Defendant. | ) | |

This matter was referred to the Magistrate Judge to conduct an evidentiary hearing on the Government's Motion to Revoke Supervised Release, filed on August 5, 2022. (Doc. 244) The motion alleges that the defendant violated Special Condition #6 which states, "You are prohibited from being self-employed in the legal field but may work as such an employee with the prior approval of the probation officer if your employer is aware of potential third-party risks." (Doc. 190)

An Evidentiary Hearing was held before the Magistrate Judge on November 16, 2022. Defendant Madril was present in person, out of custody, and was assisted by counsel. The Court called U.S. Probation Officer (USPO) Bill Grajeda but allowed the attorneys to conduct examination of the witness. The defense called Richard S. Madril and the defendant to testify. Government's exhibits 6 and 7, recordings of the August 2021 meeting between defendant and Lucia Duarte, were admitted without objection, for purposes of this hearing only. Transcripts of exhibits 6 and 7 are attached to the government's motion (Doc. 244), as exhibits 244-5 and 244-6 respectively. It is apparent

from the recordings and the transcripts that the recordings started partway into the conversation and ended prior to the conclusion of the meeting. Defendant's exhibits 4 and 5 were referred to during the defendant's testimony. They are letters in English and Spanish that the defendant sent to his former client Ernesto Jaquez-Aguirre, dated January 25, 2021, and March 20, 2021. The letters advise that Mr. Madril was suspended from practice by the Arizona State Bar and immigration authorities, respectively.

At the conclusion of the evidence the government requested a transcript of the hearing and an opportunity for the parties to submit briefs prior to the Court issuing its Report and Recommendation. The Court granted the request. On November 22, 2022, the official transcript of the hearing was entered into the docket sheet. (Doc. 287) On November 30, 2022, defense counsel moved to withdraw due to medical issues. (Doc. 282) The Court granted the motion and appointed new counsel on December 2, 2022. (Doc. 28) That same day the government filed its brief. (Doc. 284) The Court set a telephonic status conference to address the timing for new defense counsel to file his brief. There being no objection, the defendant was ordered to and filed his brief on December 19, 2022. (Doc. 290) The Court reviewed both parties' briefs prior to completing this Report and Recommendation.

The Magistrate Judge recommends that after de novo review, the District Judge find that Mr. Madril did not violate special condition # 6 and deny the government's motion.

**Procedural Background:**

On December 6, 2019, a jury found the defendant guilty of Count 1 of the Superseding Indictment, which charged him with Conspiracy to Commit Offense or to Defraud the United States, in violation of Title 18 U.S.C. § 371. The Court sentenced him on December 2, 2020, to three months in prison with five years of supervised to follow. The Court imposed 22 conditions of supervised release, including special condition #6. (Doc. 190). On September 1, 2022, the Court amended the judgment but special condition # 6 remained the same. (Doc. 246)

**FACTS:**

**Bill Grajeda** testified that he has been a U.S. Probation Officer (USPO) for the District of Arizona for 23 years. (17:21-25)[1] He supervised Defendant Madril starting from when he reported to the probation officer the day after the defendant's release from prison. (18:1-2,8) Officer Grajeda reviewed each of the supervised release conditions, including special condition #6 with the defendant, who advised the USPO that he would be working for his father in his father's law office. (18:17-19, 23-24) They had an "extra conversation" about how to manage that to be sure that Defendant Madril did not present himself as an attorney to people coming into the law office. (18-19:24-25, 2-3)

Officer Grajeda also spoke with Richard S. Madril, the defendant's father, and had him sign a third-party risk form acknowledging his awareness of the third-party risk. (19:10-13) Richard S. Madril described the defendant's job as office manager, paralegal, errand runner, maintenance, supply procurer, etc. (19:18-21) Special condition #6 was reviewed with the defendant more than once. (20:2-3) In the USPO's opinion, Defendant Madril was not self-employed in the legal field and the probation officer approved of his employment. (20:12-14, 20-22) Defendant Madril was cooperative on supervised release and was moved to a lower level of supervision. (21:13-19)

As it pertains to the facts of the alleged violation, Officer Grajeda was made aware that the defendant met with his former client Lucia Duarte. Officer Grajeda received recordings of the meeting and a report from Homeland Security Investigations (HSI), through his supervisor. He reviewed the items (22:20-25) and then spoke with Defendant Madril about the situation without getting into the details of the investigation. (23:12-15) He and his supervisor decided they would assure that Defendant Madril understood special condition #6 but they would not file a petition to revoke. (23:12-15, 18-21)

---

1 Reporter's Transcript8 from 11/16/22 Evidentiary Hearing

After reviewing the recordings, Officer Grajeda testified that the meeting between Lucia Duarte and Defendant Madril took place at the Law Office of Richard S. Madril. (26:8-15) He did not hear the voice of Richard S. Madril on the recordings. (26:16-17, 21) The conversation was about Lucia Duarte's husband, Ernesto's immigration case. (27:5-7) Defendant Madril gave some advice about the consequences of going to and returning from Mexico. (29:2-23) After Officer Grajeda reviewed the HSI information and had a conversation with Defendant Madril, he was confident that Defendant Madril was still employed by his father and not working as an attorney. (32:23-25)

**Richard S. Madril** testified that he has been a licensed private attorney for about 30 years in the state of Arizona. (46:19-25) He is also the presiding judge for the City of South Tucson. (47:8) Richard A. Madril is his son and is employed at his law firm. (47:9-12) Richard S. Madril is aware that his son has a felony conviction, and he was advised of the risks in connection with that. (47:16-17, 22-24) Richard A. Madril is employed as a legal assistant/paralegal. (48:2) They work closely together. Richard A. Madril follows his father's directions most of the time. (48:3-5) They see each other almost every day. (50:1-4)

At the peak of his career, Richard S. Madril's office employed three attorneys and six secretaries/paralegals. (48:8-10) He did not require an attorney's presence when a paralegal met with a client, just as he does not require his son to have him present when he meets with clients. (48:11-16) Defendant Madril is permitted to meet with prospective clients at the preconference. (48:17-19) If the client wants a legal advisory conference, he meets with Richard S. Madril. (48:20-21) He believes he is meeting his ethical requirements for supervising his son. (49:7-10) Richard A. Madril is allowed to give out general documents and he asks if he thinks he needs his father's approval. (49:20-23) In supervising law firm employees Mr. Madril provides parameters of the job and occasionally sits in with them to audit their performance. (63:5-11)

Richard S. Madril was aware that his son was meeting with Lucia Duarte last August. (51:5-8) He discussed with his son what he would charge if she wanted to hire the firm. (51:17-19) Sometimes people come for an initial consultation, but they do not end up signing a contract. (52:9-11) Richard A. Madril talked to his father about Lucia Duarte as a former client and about the possibility she might return as a client of the firm. (52-52:23-25, 3) Richard S. Madril did not believe his son was giving legal advice. (53:14-15) Generally they try to tell clients about the steps they will need to take but that is not legal advice because it's general information. (54:6-8, 13-14) Richard S. Madril did not take Mr. Aguirre as a client. (54:23-25) His law practice includes many areas of law including immigration law. (57:23-24)

The government brought out testimony from Mr. Madril regarding a State Bar reprimand where the Bar found that Mr. Madril failed to have a client sign a contract regarding the scope of representation and the basis of fees and expenses. (61:14-17, 21-23) Mr. Madril also testified that he loves his son, considers him a good employee and it would be more difficult if his son did not work at the firm. (56-57:24-25, 1-3, 6-8)

**Richard A. Madril** testified that he has been on supervised release since the end of June of 2021. (68:10-11,16) Bill Grajeda was his original probation officer. (68:17-18) Officer Grajeda reviewed everything with Mr. Madril including special condition #6. (69:5-7) Mr. Madril understood that he was precluded from being self-employed in the legal field. (69:8-10) He told Officer Grajeda that he would be working for his father, not as an attorney. (69:12-13, 18) He has no clients of his own. (70:2) After Mr. Madril paid his restitution and complied with the supervised release conditions, Officer Grajeda moved him to a lower intensity of supervision. (78:20-22)

Defense exhibit 4 is a standard letter, dated 1/25/21, that was sent to all his former clients advising them that he was no longer an attorney. He advised that he was suspended from practicing in immigration court and was suspended by the Arizona State Bar. (70:4-9, 15-19, 23-24) A copy of the letter was sent to his former client, Ernesto Jacquez Aguirre

to his last known address. (71:2-8) Mr. Madril believed they received the letters because they were mailed by U.S. mail with correct postage and the letters were never returned. (97:5-20)

At the end of July Mr. Aguirre's wife, Lucia Duarte, texted Mr. Madril. (72:13-15) He did not want to meet with her, but he set up the August meeting. (72-73:18-19, 1-4) Mr. Madril discovered a BIA decision for Ms. Duarte's husband in the pile of mail that had accumulated and that he reviewed upon his release from prison. (73:7-12) The document was related to work done prior to his conviction and he was advised by the Bar to provide documents to former clients. (73:18-20, 23-24) Once Mr. Madril was suspended from practice, he no longer received documents from the courts. (74:12-14)

Prior to the meeting, Ms. Duarte told Mr. Madril that she did not know what was going on with her case. (74:18-19) He told her that he had the appeal decision for her, and she should call when she was ready to come by. (74-75:21-22, 2-4) Mr. Madril rushed Lucia Duarte and her daughter Marisol during the meeting because he was uncomfortable.[2] He wanted to give them the information and have them leave. (75:16, 20-22) He believed Ms. Duarte knew he was not her attorney. (76:5) He told her several times that he could not help her, but his father could. (76:9-11) The meeting took place in his father's office lobby. (77:6) He did not take Ms. Duarte into the formal office where Richard S. Madril does intake and has confidential conferences. (77:9-12)

Mr. Madril has a very close relationship with Ms. Duarte. (80:10-11, 19) They spoke about the history of the case. (81:10) He told her about the protocol for an I-131, which is information that can be found on the immigration services website. (81:19, 23) Mr. Madril told Ms. Duarte she could go to the consulate to get IDs. (82:2-4) They had a casual

---

2 See Doc. 244-4, HSI report wherein Lucia Duarte told the agent that Mr. Madril looked nervous. The meeting lasted about 10 minutes and took place in the law office lobby. Ms. Duarte said she felt rushed, as if Mr. Madril wanted to get rid of them as soon as possible.

conversation about the earned income tax credit because Mr. Madril knows that money is tight for them. (84:4-9) Ernesto Aguirre is severely disabled, they have been unable to work and that has created a lot of stress for Ms. Duarte. (88:1-3) He told them that Mr. Aguirre may not need a work permit but if he wants one Richard S. Madril could help them and would charge $500. (84-85:8-10,23-25, 1-3) They would need photos and an application. (86:12-13) Defendant Madril could help them but he would have to "run it in to my father." (86:18-19)

After Mr. Madril gave Ms. Duarte the BIA order, at her request he went back to his desk to access the EOIR website to provide Ms. Duarte with a summary of the case. (88:13, 18-20) An immigrant can access the same information from the website on her own. (90:1-6) There was some discussion about the money that Ms. Duarte still owes Mr. Madril from the previous representation. (91:1-3) She brings it up regularly but has no intention of paying it off. (91:7-9) Mr. Madril considers the money gone and does not want to pursue it because of his situation. (92:2-5)

Mr. Madril advised Ms. Duarte that the BIA order was sent on July 23rd to their last known address. (93:3-5) Ms. Duarte and her daughter discussed between themselves that maybe they did receive the documents and maybe the brother has them. (93:6-11) Mr. Madril believed they had access to the mailbox where he sent the letters and so believed they received his letters about no longer representing them. (93:14, 17-18) The government offered a proffer that if Lucia Duarte and her daughter Marisol testified, they would avow that that they did not receive the letters. (98:8-10) That is confirmed by Exhibit 244-2, the Declaration of Lucia Duarte, paragraph 12.

Mr. Madril does not have any proof of mailing. (96:5-7) When HSI executed a search warrant at his law office in 2016 they discovered "lots of fake letters". (96:14-23)

**DISCUSSION:**

The government's position is that when Defendant Madril met with Lucia Duarte he was acting outside the scope of his employment at his father's law firm. It argues that

Mr. Madril gave legal advice to Ms. Duarte and her daughter which gave them the impression that he was still their attorney. He never advised his former client that he was no longer an attorney. He met with the Duartes in the lobby of the law office rather than in the private office space that was the usual place to meet with a new client of his father's law firm. Ms. Duarte never became a client of Richard S. Madril.

It is the government's position that if Defendant Madril was engaged in the unauthorized practice of law, and was not being properly supervised by his father, he was self-employed in the legal field, in violation of special condition #6. The government challenged the credibility of Richard A. Madril and Richard S. Madril.

In his brief,[3] the defendant argues that a defendant on supervised release is not typically in an adversarial relationship with his probation officer. Probation officers try to be clear with their probationers about what is expected of them to comport with their conditions of supervised release. If a defendant struggles, the officer will generally give the defendant an opportunity to explain his conduct and to adjust his behavior to come back into compliance. That was not done in this case because the probation officer did not believe there were compliance issues, even after reviewing recordings and reports from the government, which form the basis of the government's motion to revoke.

Defendant Madril explains that there is no evidence that he was engaged in the practice of law, was trying to deceive Ms. Duarte or was trying to collect attorney's fees owed from the prior representation.  After sending Lucia Duarte two letters explaining that he was no longer a practicing attorney, Ms. Duarte texted Mr. Madril several times over a period of months, to which he did not respond.

In August 2021 Defendant Madril answered a phone call from Ms. Duarte because he had a legal document for her and was required to provide all former clients with their

---

3 Some of the arguments in the brief were also made by prior counsel but the Court is including the current attorney's arguments to be sure that new counsel has an opportunity to be heard.

complete files. He met with her at his father's law office, which is a separate and distinct location from the office where he formerly practiced law. When Ms. Duarte was interviewed by an HSI agent she complained that during the meeting Mr. Madril was avoiding them, rushing them, and seemed nervous. The agent referred repeatedly to restitution that Ms. Duarte could get from this "dirty immigration attorney", creating a conflict of interest beyond Ms. Duarte's possible agenda of having her husband's immigration case reopened. Defendant Madril argues that there is evidence that Ms. Duarte learned from family members and social media that the Madrils were prosecuted and that perhaps the Duartes were entitled to restitution.

In summary, Defendant Madril characterizes the government's position as an allegation "…that Richard A. Madril overstepped his role as 'legal assistant', and that his employer, and his probation officer, failed to supervise him." None of that constitutes a violation of special condition #6.

There is no dispute that Richard A. Madril was employed by the law office of Richard S. Madril. The government does not question that the probation officer gave prior approval for the employment. There is no disagreement that Richard S. Madril was aware of the potential third-party risks. The Court is asked to determine if Richard A. Madril was self-employed in the legal field by virtue of his interaction with Lucia Duarte at a meeting in August 2021.

The defendant argues that he did not give legal advice to the Duartes. He testified that well before he met with them, he sent letters to the Duartes by U.S. mail with proper postage, as he did to all his former clients, advising them that he was no longer allowed to practice law. He believed they received the letters because the letters were not returned to him. Ms. Duarte contacted Defendant Madril and asked about her husband's case. He did not want to meet with her, but he had an order from the court that he was obligated to provide to her. Any other information he provided to Ms. Duarte was general information, not specific to her husband's case. Defendant Madril provided information and a document

to Ms. Duarte that an immigrant can acquire directly without the assistance of an attorney. Self-employment, like any other employment means some expectation of wages for service. Here there is no evidence that the defendant tried to get any money from the Duartes.

Richard S. Madril was aware of the meeting with Lucia Duarte and advised his son that he could help them apply for a work permit. Richard S. Madril told Richard A. Madril what fees the law firm would charge for the work. The Court notes that Ms. Duarte and her daughter never questioned why Richard A. Madril could not represent them in getting the work permit nor why he was trying to pass the case to his father.

Richard A. Madril is adamant that at all times since being place on supervised release he has worked as a paralegal/legal assistant, under the direct supervision of his attorney father. He only spoke with Ms. Duarte about the outstanding attorney's fees from his prior representation because she brought it up, which she frequently did. He may be entitled to collect those fees but has no intention of doing so because of his legal situation. He met with Ms. Duarte in the lobby of his father's law office and rushed through the meeting because he was uncomfortable and wanted her to leave.

Defendant Madril discussed special condition #6 with his probation officer on more than one occasion. He was clear about the parameters of the condition. He got prior approval from Officer Grajeda to work for his father. His father submitted a written notice regarding his awareness of potential third-party risks. Richard S. Madril supervises Defendant Madril the same way that he supervises all his employees. Defendant Madril did so well on supervised release that the supervising probation officer moved him to lower intensity supervision.

**Law:**

A court may revoke a defendant's supervised release if it finds by a preponderance of the evidence that the defendant violated a condition of supervision. 18 U.S.C. § 3583(e)(3) *United States v. Musa*, 220 F.3d 1096, 1100 (9th Cir.), *cert. denied*, 531 U.S.

999, 121 S.C. 498, 148 L.Ed.2d 469 (2000); *see also* 18 U.S.C. § 3583(e)(3). Ninth Circuit Model Civil Jury Instruction 1.6 defines the preponderance of evidence as "evidence that is more probably true than not." The government did not meet its burden.

The Magistrate Judge is required to make credibility findings as to witnesses who testify before her in an evidentiary hearing. *See U.S. v.* Mejia, 69 F.3d 309, 316 (9th Cir. 1995) As discussed in further detail in the analysis section below, the Magistrate Judge finds all witnesses who testified to be credible.

**Analysis:**

The evidence shows that Mr. Madril was aware of and understood special condition #6 of his conditions of supervised release. He was employed at his father's law firm as a paralegal, with prior permission from his probation officer. His employer/father was well-aware of potential third-party risks.  Richard S. Madril had nearly daily contact with his son and supervised him to the same extent that he supervised all other employees.

Richard S. Madril was aware ahead of time that his son would be meeting with Lucia Duarte. They discussed the possibility of engaging Ms. Duarte as a client of the firm, including what the attorney's fees would be. Richard A. Madril met with the Duartes in the lobby of the law firm, out in the open, rather than in a private, confidential office, where a lawyer would meet with a client. Richard A. Madril believed that Lucia Duarte had received the letters he sent to her last known address advising her that he was no longer permitted to practice law. The fact that she never questioned why he spoke to her about his father representing her and the fee his father would charge is some indication that she understood that Defendant Madril could no longer represent her.

The government focused a great deal on the alleged unauthorized practice of law to support its position that during the meeting with Lucia Duarte, Richard A. Madril was acting in the capacity of an attorney and was therefore self-employed. Whether or not Richard M. Madril engaged in the unauthorized practice of law does not resolve the question of whether he was self-employed in the legal field in violation of special condition

- 11 -

#6.  All evidence presented proved that Defendant was employed by his father as a paralegal and worked out of his father's law office, under his father's supervision.

The government was critical of how and to what extent Richard S. Madril supervised his non-attorney/employee son. The evidentiary hearing is not the proper forum to litigate that issue and Richard A. Madril cannot be held responsible under his conditions of supervised release for his father's shortcomings, if any. The government also questioned the extent to which the probation officer conducted his own investigation into the government's theory of the violation. Officer Grajeda made it clear that he had sufficient information to decide not to file a petition and he has no intention of pursuing this further.

Despite the evidence that Richard S. Madril was once admonished by the State Bar for failing to execute a contract with a client, the Court finds his testimony credible. Although at the trial of Defendant Madril there was evidence that in 2016 he lied to clients and possessed numerous false letters at the law office he shared with his wife, the Court finds his testimony at the evidentiary hearing was credible. The Court cannot conclude that a person who engaged in dishonesty six years ago, served his sentence and then performed nearly flawlessly on supervised release is forever a liar in all matters.

**CONCLUSION:**

The Magistrate Judge finds that the government did not prove by a preponderance of the evidence that Defendant Madril knowingly violated special condition #6.

Based on the foregoing and pursuant to 28 U.S.C. § 636 (b) and Local Rule 1.7(d)(2), Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge **RECOMMENDS** that the District Court, after an independent review of the record, find that the Defendant did not violate his condition of supervised release, and deny the government's motion to revoke conditions. The government may serve and file written objections with the District Court within fourteen (14) days of being served with a copy of this Report and Recommendation.  If objections are not timely filed, the party's right to de novo review may be waived.  No reply to objections shall be filed unless leave is granted from the District Court.

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

Dated this 21st day of December, 2022.

Honorable Leslie A. Bowman
United States Magistrate Judge